CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
May 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA ROANOKE DIVISION

|  |  |
|---|---|
| METE ENDER TUNCAY, DVM on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN ASSOCIATION OF VETERINARY CLINICIANS, SOLUTION INNOVATIONS, INC., AMERICAN ASSOCIATION OF VETERINARY MEDICAL COLLEGES, THE AMERICAN VETERINARY MEDICAL ASSOCATION, VCA ANIMAL HOSPITALS, INC., ETHOS VETERINARY HEALTH LLC, PATHWAY VET ALLIANCE, LLC D/B/A THRIVE PET HEALTHCARE, MEDVET ASSOCIATES, LLC, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF PENNSYLVANIA SCHOOL OF VETERINARY MEDICINE, TRUSTEES OF TUFTS COLLEGE, TUFTS UNIVERSITY CUMMINGS SCHOOL OF VETERINARY MEDICINE, CORNELL UNIVERSITY, CORNELL UNIVERSITY COLLEGE OF VETERINARY MEDICINE, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, THE COLLEGE OF VETERINARY MEDICINE AT THE UNIVERSITY OF FLORIDA, OHIO STATE UNIVERSITY, OSU COLLEGE OF VETERINARY MEDICINE, TEXAS A&M UNIVERSITY SYSTEM, and TEXAS A&M COLLEGE OF VETERINARY MEDICINE AND BIOMEDICAL SCIENCE,<br><br>Defendants. | Case No: 7:25cv00369<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Plaintiff Mete Ender Tuncay brings this action on behalf of himself and all others similarly

situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants American

Association of Veterinary Clinicians ("AAVC"), Solution Innovations, Inc., American Association of Veterinary Medical Colleges ("AAVMC"), American Veterinary Medical Association ("AVMA"), VCA Animal Hospitals, Inc. ("VCA"),  Ethos Veterinary Health LLC ("Ethos"), Pathway Vet Alliance, LLC d/b/a Thrive Pet Healthcare ("Thrive"), MedVet Associates, LLC ("MedVet"), Trustees of the University of Pennsylvania ("Penn"), University of Pennsylvania School of Veterinary Medicine ("Penn Veterinary School"), Trustees of Tufts College ("Tufts"), Tufts University Cummings School of Veterinary Medicine ("Tufts Veterinary School"), Cornell University ("Cornell"), Cornell University College of Veterinary Medicine ("Cornell Veterinary College"), University of Florida Board of Trustees ("University of Florida"), The College of Veterinary Medicine at the University of Florida ("UF Veterinary College"), Ohio State University ("OSU"), OSU College of Veterinary Medicine ("OSU Veterinary College"), Texas A&M University System ("Texas A&M"), and Texas A&M College of Veterinary Medicine and Biomedical Science ("Texas A&M Veterinary College")  (collectively, "Defendants"). Plaintiff seeks treble damages, costs, and attorneys' fees for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and seeks to enjoin Defendants from continuing their unlawful conspiracy.

## I.  NATURE OF THE ACTION

1.      Defendants are for-profit veterinary practices and companies, veterinary teaching institutions, and veterinary associations that have engaged in a long-standing, nationwide conspiracy to depress compensation for veterinary interns and residents.

2.      As a result of Defendants' conspiracy, veterinary interns and residents endure poor working conditions, long hours, and compensation that often falls below a living wage. Veterinary

interns and residents experience unusually high rates of depression, post-traumatic stress disorder, and suicidal ideation, often associated with workload demands and financial insecurity.

3.     Defendants can suppress salaries and benefits and impose such difficult working conditions on veterinary interns and residents because Defendants have engaged in a scheme to eliminate competition in the market for veterinary resident and intern services.

4.     Defendants design, implement, and/or participate in the Veterinary Internship and Residency Matching Program ("VIRMP" or the "Match Program"). Through the Match Program, Defendants restrain competition in the recruitment, hiring, and employment of veterinary interns and residents. The Match Program consists of a centralized allocation system that assigns veterinary resident and intern applicants to a single, specific position at an employer that participates in the program, and contractually mandates their acceptance of that position. It prohibits all salary negotiations between applicants and prospective employers, enforces strict limitations on applicant mobility and choice, and implements policing mechanisms to compel compliance with these restraints.

5.     Upon information and belief, Defendants also exchange detailed information on salaries offered through individual internship and residency programs in furtherance of their conspiracy to suppress wages. Defendants conduct an annual survey of veterinary intern and resident compensation, analyze the collected data, share that compensation data among employers, and provide wage "guidance" for employers that is far lower than comparable veterinary positions that do not participate in the Match Program.

6.     The intended and actual effect of Defendants' conspiracy has been to suppress wages and worsen working conditions for Plaintiff and similarly situated veterinary interns and

residents. Defendants' conspiracy maximizes the profits of Defendant employers by reducing labor costs.

## II.  JURISDICTION, VENUE, AND INTERSTATE COMMERCE

7.      Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15(a) and §26, to obtain injunctive relief and recover treble damages, cost of suit, and reasonable attorneys' fees for Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1337(a).

8.      This Court has personal jurisdiction over Defendants pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. §22.

9.      Venue is proper in this Court pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391 because Defendants regularly transact business within this district, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and some Defendants reside in this District.

10.     The services at issue in this case are sold in interstate commerce. The unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce in the United States.

## III.  PARTIES

### A.  Plaintiff

11.     Plaintiff Mete Ender Tuncay, DVM, served as an oncology intern from approximately June 2020 to June 2021 at Blue Pearl in Sandy Springs, Georgia, a position he obtained through the Match Program. Dr. Tuncay currently resides in Atlanta, Georgia.

B. **Match Administration Defendants**

12.     Defendant American Association of Veterinary Clinicians ("AAVC") is a membership organization of veterinary practitioners engaged in teaching and/or research at the professional, graduate, or postgraduate level at veterinary colleges in the United States and Canada. The AAVC sponsors the Match Program. The AAVC is a nonstock Illinois corporation with its principal place of business in Blacksburg, Virginia. Its Executive Director is Jonathan Austin, who owns Defendant Solution Innovations, Inc., and is the Executive Director of the Match Program.

13.     Defendant Solution Innovations, Inc. is a stock corporation registered in Virginia. Solution Innovations provides web development and database design for four clients, one of which is the Match Program. Solution Innovations' President is Jonathan Austin, and it has its principal place of business in Blacksburg, Virginia.

14.     Defendant American Association of Veterinary Medical Colleges ("AAVMC") is a non-profit corporation chartered in Washington, D.C. AVMC was formed in 1966 by the deans of several U.S. and Canadian veterinary colleges. It advocates for the interests of academic veterinary medicine institutions. AAVMC partners with AAVC to collect and publicize data on the Match Program internship and residency salaries, benefits, and working conditions. AAVMC's annual revenue in 2023 was $7.69 million, and it has its principal place of business in Washington, D.C.

15.     Defendant American Veterinary Medical Association ("AVMA") is a 501(c)(6) organization chartered in Illinois that represents the needs of veterinarians. The AAVC considers the AVMA an "allied organization," and AVMA has a voice in AAVC decision-making, including on matters related to the Match Program. AVMA publishes internship guidelines and policies on

4

internship and residency programs. Its 2022 revenue was $49.5 million, and it has its principal place of business in Schaumburg, Illinois.

16.     Collectively, AAVC, Solution Innovations, AAVMC, and AVMA are the "Match Administration Defendants."

### C. Employer Defendants

17.     Defendant VCA Animal Hospitals, Inc. ("VCA") operates more than 1,000 animal hospitals in the United States and Canada and touts itself as "the largest animal health network in North America." In 2017, Mars, Inc. purchased VCA for $9.1 billion. Throughout the relevant time period, VCA has hired veterinary interns and residents through the Match Program. VCA has its principal place of business in Los Angeles, California.

18.     Defendant Ethos Veterinary Health LLC ("Ethos") is a limited liability company organized under the laws of Delaware, with its principal place of business in Woburn, Massachusetts. Ethos operates more than 140 specialty and emergency hospitals across North America. In 2022, JAB Consumer Partners, a private equity firm, purchased the parent company of Ethos, National Veterinary Associates, Inc., for $1.65 billion. As part of the acquisition, the U.S. Federal Trade Commission ("FTC") ordered JAB to divest clinics in Richmond, Denver, San Francisco, and Washington, D.C., to "prevent private equity firm JAB Ethos from gobbling up competitors in regional markets that are already concentrated." Throughout the relevant period, Ethos has hired veterinary interns and residents through the Match Program.

19.     Defendant Pathway Vet Alliance, LLC d/b/a Thrive Pet Healthcare ("Thrive") is a limited liability company organized under the laws of Delaware, with its principal place of business in Austin, Texas. Thrive operates approximately 340 general practice, specialty, and emergency veterinary hospitals, and approximately 115 veterinary clinics throughout the United

States. Thrive is owned by private equity firm TSG Consumer. Throughout the relevant period, Thrive has hired veterinary interns and residents through the Match Program.

20.    Defendant MedVet Associates, LLC ("MedVet") is a limited liability company organized under the laws of Ohio, with its principal place of business in Worthington, Ohio. MedVet operates a chain of veterinary emergency and specialty hospitals, with over 35 locations in 17 states. Throughout the relevant period, MedVet has hired internship and residency positions through the Match Program.

21.    Collectively, VCA, Ethos, Thrive, and MedVet are the "Employer Defendants."

### D. **Veterinary School Defendants**

22.    Defendant Trustees of the University of Pennsylvania ("Penn") is a private, educational institution with its principal place of business in Philadelphia, Pennsylvania. Penn had an endowment of approximately $20.5 billion as of 2021. Penn is a member institution of the AAVC, which sponsors the Match Program. Barabara Dallap Schaer, the Medical Director of Penn's School of Veterinary Medicine's New Bolton Center, sits on the Executive Committee for the AAVC.

23.    Defendant University of Pennsylvania School of Veterinary Medicine ("Penn Veterinary School") is the veterinary college at the University of Pennsylvania. Its principal place of business is located in Philadelphia, Pennsylvania. Penn Veterinary School participates in the Match Program and currently offers internship and residency positions through the Match Program.

24.    Defendant Trustees of Tufts College ("Tufts") is a private educational institution. As of 2024, Tufts had an endowment of approximately $2.6 billion. Tufts is a member institution of the AAVC, which sponsors the match program.

25.     Defendant Tufts University Cummings School of Veterinary Medicine ("Tufts Veterinary School") is the veterinary school at Tufts. It is located in North Grafton, Massachusetts. Tufts Veterinary School participates in the Match Program and currently offers internship and residency positions through the Match Program.

26.     Defendant Cornell University ("Cornell") is a private, educational institution with its principal place of business in Ithaca, New York.  Cornell is a member of the AAVC, which sponsors the Match Program.  In 2024, Cornell had an endowment of approximately $10.7 billion.

27.     Defendant Cornell University College of Veterinary Medicine ("Cornell Veterinary College") is the veterinary college at Cornell University, located in Ithaca, New York. Cornell Veterinary College participates in the Match Program and currently offers internship and residency positions through the Match Program.

28.     Defendant University of Florida Board of Trustees ("University of Florida") is the Board of Trustees for the University of Florida, a public, educational organization. In 2024, the University of Florida had an endowment of approximately $2.4 billion. The University of Florida is a member of the AAVC, which sponsors the Match Program.

29.     Defendant The College of Veterinary Medicine at the University of Florida ("UF Veterinary College") is the veterinary college at University of Florida. Chris Sanchez, the Associate Dean of Clinical Services for Large Animal Operations at the University of Florida College of Veterinary Medicine, is the President of the Executive Committee of AAVC. The UF Veterinary College participates in the Match Program and currently offers internship and residency positions through the Match Program.

30.     Defendant Ohio State University ("OSU") is a state university with its principal location in Columbus, Ohio. In 2024, OSU had an endowment of $7.9 billion. OSU is a member of the AAVC, which sponsors the Match Program.

31.     Defendant OSU College of Veterinary Medicine ("OSU Veterinary College") is the veterinary college at OSU, located in Columbus, Ohio.  Roger Fingland, the Executive Associate Dean and Chief Medical Officer of the OSU College of Veterinary Medicine, is a member of the Executive Committee of AAVC. OSU Veterinary College participates in the Match Program and currently offers internship and residency positions through the Match Program.

32.     Defendant Texas A&M University System ("Texas A&M") is a public university with its principal place of business in College Station Texas. Texas A&M is a member of the AAVC, which sponsors the Match Program.

33.     Defendant Texas A&M College of Veterinary Medicine and Biomedical Science ("Texas A&M Veterinary College") is the veterinary college at Texas A&M, located in College Station, Texas. Texas A&M Veterinary College participates in the Match Program and currently offers internship and residency positions through the Match Program.

34.     Collectively, Penn, Penn Veterinary School, Tufts, Tufts Veterinary School, Cornell, Cornell Veterinary College, University of Florida, UF Veterinary College, OSU, OSU Veterinary College, Texas A&M, and Texas A&M Veterinary College are the "Veterinary School Defendants."

## IV.  THE MATCH PROGRAM

35.     The Match Program, sponsored by the AAVC, was established in 1978. The Match Program places recent or upcoming veterinary school graduates with internships and residencies in veterinary clinics and hospitals that provide care to animals.

36.    The Match Program has grown dramatically in size since 1988, the earliest year that comprehensive data has been made publicly available. In 1988, 309 resident applicants applied for 141 residency slots, and 473 internship applicants applied for 175 internship slots. By 2024, 1,138 residency applicants applied for 484 residency slots, and 1,690 internship applicants applied for 1,558 internship slots.

37.    Veterinary internships are typically one-year employment positions undertaken immediately or soon after graduation from a Doctor of Veterinary Medicine ("DVM") program or equivalent.

38.    Veterinary residencies are typically three-to-four-year positions, with an internship as a prerequisite, in a specialized veterinary care field such as cardiology, oncology, or surgery. Residencies are generally prerequisites for board certification in an AVMA-recognized veterinary specialty.

39.    Interns and residents provide critical labor for employers including the Employer Defendants and the Veterinary School Defendants. Interns and residents complete clinical and formal rounds, manage cases, interact and consult with specialists, and supervise veterinary students, among other tasks.

40.    Interns and residents work notoriously long hours.  In a recent survey, most respondents reported working 11- to 13-hour weekdays on average, with some specialties reaching 14 hours or more. Nearly half of those surveyed reported working on the weekends as well—many for six hours or more per day. This combination of low pay and long hours means that many interns and residents make less than the hourly living wage.  The grueling schedule often has disastrous impacts on their physical, mental, and occupational wellbeing.

9

41.    The Match Program matches applicants with internship and residency programs using a computerized system.  Defendant AAVC administers the Match Program.

42.    Each September, employers who hire veterinary interns and residents, including the Employer Defendants and the Veterinary School Defendants, enter their internship and residency information into the VIRMP database.  In October, the Match Administration Defendants use that information to publish a list of available internship and residency positions, which is supplemented and updated until the beginning of November.

43.    The Match Program application becomes available to applicants every November. Each applicant supplies a list of the internship and residency programs to which they wish to apply, ranked in order of preference, along with other application materials, including the applicant's academic record and work experience.  Applicants have until the first week of January to submit their application and must submit their rank-order lists in February.  The institutions and employers who sponsor the internship and residency programs then review the application materials and provide the Match Program with a rank-order list of the applicants being considered for their program.

44.    Using the rank-order lists, the Match Program matches applicants to internship and residency positions using a computer algorithm developed by Defendant Solution Innovations under a contract with Defendant AAVC.  Each applicant is offered only one internship or residency position, and the results of the Match Program are released each March on a day known as "Match Day."  After Match Day, a list of unmatched applicants is sent to the participating employers, who are free to make additional employment offers at their discretion.

45.    To hire interns and residents through the Match Program, institutions like the Employer Defendants and the Veterinary School Defendants must agree to the Match Program's

"Institution Terms of Service" and complete internship and residency submission forms. The submission forms require detailed information about the program, including compensation, program costs, and available benefits. Veterinary practices and teaching institutions must pay $100 per position submitted to the Match Program.  On information and belief, each Employer Defendant and each Veterinary School Defendant has, in fact, agreed to the Match Program's Institution Terms of Service.  Those Defendants have also, on information and belief, completed the internship and residency submissions forms and paid the $100-per-position fee for each year in which they participated in the Match Program.

46.    On information and belief, the Match Administration Defendants developed the Institution Terms of Service.  The Institution Terms of Service contain several requirements that enable Defendants to suppress competition for applicants.  In acquiescing to those terms of service, institutions like the Employer Defendants and the Veterinary School Defendants agree not to negotiate with applicants, agree not to make commitments or contracts with applicants prior to the notification of match results, and agree not to pursue or offer employment to applicants matched elsewhere by the Match Program unless the applicant has obtained a written release from his or her matched employer.

47.    The Match Administration Defendants implement policing mechanisms to compel compliance with these restraints, including harsh sanctions on violators. Violation of the Institution Terms of Service results in a ban from participating in the Match Program for a period of at least three years.

48.    Veterinary institutions could choose not to participate in the Match Program and could instead offer internship and residency positions outside the Match Program.  But very few do; over 90% of veterinary institutions elect to hire interns and residents through the Match

11

Program.  Because those veterinary institutions have agreed to offer internship and residency positions only through the Match Program, most veterinary students and veterinarians wishing to pursue such opportunities ***must*** participate in the Match Program.  They have no alternative means of securing a veterinary internship or residency.

49.    To participate in the Match Program, veterinarians must agree to Applicant Terms of Service, which, on information and belief, were developed and authored by the Match Administration Defendants.  The Applicant Terms of Service require applicants to agree, at the time they apply to the Match Program, that they will "accept appointment to the institution with which [they are] matched."  The Applicant Terms of Service also require the applicants to acknowledge that they "cannot avoid accepting an internship or residency to which [they are] matched without a written release from that institution," and that other institutions participating in the Match Program cannot hire them without that release. The Applicant Terms of Service further require applicants to agree to the following statement: "I shall not negotiate for nor accept a position prior to the release of the match results with a program listed in the VIRMP or a similar program at the same institution/private practice."

50.    The Match Administration Defendants impose sanctions on applicants who do not comply with the Applicant Terms of Service.  Those sanctions include a ban from participation in the Match Program for at least three years. In practice, a ban from the Match Program effectively precludes a veterinarian from obtaining an internship or residency.

51.    The Match Program's website reinforces and emphasizes the restrictions imposed by the Institution Terms of Service and the Applicant Terms of Service, stating, "Neither [applicants nor institutions] may negotiate inside or outside the matching program until the match results have been announced. Doing so is a violation of VIRMP rules and will result in a sanction."

52.     The Institution Terms of Service and the Applicant Terms of Service have a profoundly negative effect on the ability of Match applicants, like Plaintiff, to freely negotiate the terms of their employment for intern and residency positions.  Once an applicant applies to the Match Program, he or she cannot negotiate with any institution that also participates in the Match Program—essentially, all institutions offering veterinary internships and residencies.  The institutions are likewise prohibited from negotiating with applicants.  Because applicants to the Match Program receive only one offer on Match Day, they have no ability to bargain for better terms by threatening to take a job with another participating employer.  Applicants are contractually obligated to accept the offer they receive on Match Day, and they are contractually prohibited from pursuing employment with any other institution participating in the Match Program unless they can obtain the consent of the institution to which they matched.  The Match Program thus effectively eliminates *all* negotiation after match results are released.

53.     Through the Match Program, Defendants eliminate a free and competitive market for veterinary resident and intern services and replace it with a centralized allocation system.  Applicants have no opportunity to negotiate with prospective employers, weigh multiple employment offers, use an offer from one employer to negotiate better terms from another, or move to a different employer after Match Day.  Similarly, institutions like the Employer Defendants and the Veterinary School Defendants are prohibited from competing for applicants by offering higher compensation or better employment terms.

54.     Through their participation in the Match Program, Defendants also agree to exchange competitively sensitive information on resident and intern salaries and benefits. For example, institutions like the Employer Defendants and the Veterinary School Defendants agree to provide detailed salary information for their internships and residencies to the AAVMC.  On

information and belief, each Employer Defendant and each Veterinary School Defendant has, in fact, provided detailed salary information to the AAVMC. The AAVMC then analyzes the data and publishes highly specific salary information containing mean and median salaries for interns and residents by geographic location and practice area. In 2022, the Match Program published salary guidelines that included a suggested salary consisting of a "living wage," offering $15/hour as one such example of a living wage.

55.    With all that information in hand, institutions like the Employer Defendants and the Veterinary School Defendants can set their internship and residency salaries comfortably near the suggested salary, knowing that applicants will lack the ability to negotiate a better deal. Indeed, after 2022, average salaries for interns and residents clustered around the "living wage" example offered in the Match Program's 2022 guidance. On information and belief, Defendants exchange this salary information in furtherance of their conspiracy to suppress resident and intern compensation.

56.    Successful completion of a residency is required for certification by any of the veterinary medical specialty boards. Successful completion of an internship is typically required prior to admission into a residency program. Veterinary school graduates seeking to become specialists are effectively forced to participate in the Match Program.

## V.  THE RELEVANT MARKET

57.    The relevant geographic market ("Relevant Geographic Market") for the purposes of Plaintiff's claim is the United States. A small but significant non-transitory decrease in compensation from the competitive level could be and was imposed collectively by Defendants and unnamed co-conspirators through the Match Program, which operates across the United States (and in Canada), without causing too many veterinarians to leave the country to obtain employment

or forego the specialized career opportunities that require internships and/or residencies. A small but significant non-transitory decrease in compensation from the competitive level could be imposed by a hypothetical monopsonist that controlled all internships and residencies throughout the United States (and in Canada), without causing too many veterinarians to leave the country to obtain employment or forego the specialized career opportunities that require internships and/or residencies.

58.     The Employer Defendants and the Veterinary School Defendants operate on a nationwide basis, recruiting veterinarians from across the country and treating veterinarians as if they were participating in a nationwide labor market. The Match Program operated by the Match Administration Defendants does not maintain any specialized or discrete application processes on a regional or local basis.

59.     The relevant labor markets ("Relevant Labor Markets") for the purposes of Plaintiff's claims are the market for veterinary resident services and the market for veterinary intern services, which, as described below, have no adequate substitutes. A small but significant non-transitory decrease in compensation from the competitive level could be and was imposed collectively by Defendants and unnamed co-conspirators through the Match Program, without causing veterinarians to decline to apply for positions in the Relevant Labor Markets. A small but significant non-transitory decrease in compensation from the competitive levels could be imposed by a hypothetical monopsonist that controlled all internships and residencies throughout the United States, without causing too many veterinarians to decline to apply for positions in the Relevant Labor Markets.

60.     In the alternative, the relevant labor market ("Alterative Relevant Labor Market") for the purposes of Plaintiff's claims is the market for veterinary resident and intern services, which

as described below has no adequate substitutes. A small but significant non-transitory decrease in compensation from the competitive level could be and was imposed collectively by Defendants and unnamed co-conspirators through the Match Program, without causing veterinarians to decline to apply for positions in the Alternative Relevant Labor Market. A small but significant non-transitory decrease in compensation from the competitive levels could be imposed by a hypothetical monopsonist that controlled all internships and residencies throughout the United States, without causing too many veterinarians to decline to apply for positions in the Alternative Relevant Labor Market.

## VI.  MARKET POWER

### A.    Direct Evidence of Market Power

61.    The strongest evidence that Defendants and their co-conspirators collectively possessed the requisite power to suppress compensation for veterinary interns and residents is that they entered into agreements to reduce competition and suppress compensation. As detailed in the above sections, these agreements explicitly blocked negotiations between job applicants and employers over compensation. Defendants and co-conspirators engaged in various overt acts to restrict veterinary intern and resident bargaining power through the terms and conditions of the Match Program.

62.    The Match Program indeed suppresses wages. Veterinary resident and intern salaries are approximately half the national average earned by new veterinary school graduates, and when examined on an hourly basis, often do not even constitute a living wage.

63.    Moreover, employers, including the Employer Defendants and the Veterinary School Defendants, often pay thousands of dollars a year to participate in the Match Program.

They would not do so without receiving the benefits of a horizontal conspiracy with competitors, like cost savings by way of suppressed wages.

**B.**      **Indirect Evidence of Market Power**

64.       The vast majority of internship and residency positions are offered through the Match Program. On information and belief, the Match Program controls approximately 90 percent of intern and resident positions.

65.       A hypothetical cartel that controlled a large share of the Relevant Labor Markets or Alternative Relevant Labor Market, as Defendants and their co-conspirators collectively do here, could profitably suppress compensation paid to veterinary interns and residents below competitive levels. In such circumstances, veterinary interns and residents would not be able to defeat such artificial compensation suppression by switching employment to other non-conspiring employers.

66.       There are no close economic substitutes for employment through veterinary internships and residencies. Residencies are required for specialization. Internships are required for residencies. Thus, practice as a veterinary specialist has essentially one route: through the Match Program. A recent veterinary school graduate, moreover, cannot freely substitute employment as an attending veterinarian because doing so requires the graduate to forego the ability to become a specialist.

67.       Because of the Match Program, veterinary interns and residents cannot withhold their services until a later date as a means for negotiating for higher compensation. By contrast, in competitive markets, applicants for positions can bargain for a higher wage by threatening not to take the position or to take it only after a lengthy period of negotiation.

## VII.  EFFECT ON COMPENSATION AND WORKING CONDITIONS

68.    The price for a four-year veterinary education at an accredited institution in the United States ranges from $170,742 to $289,597 for in-state residents at public veterinary schools and $222,612 to $481,514 for private veterinary schools or nonresidents at public universities. The mean educational indebtedness acquired during a veterinary degree program at the end of the 2020 academic year among the 82% of graduates who took on loans to fund their degree was $178,585.[1]

69.    Despite the exorbitant costs and debt load veterinarians must incur, the mean annual salaries reported by AAVMC for academic internship and residency positions secured through the Match Program for the 2020-2021 training year were just $28,372 and $35,098, respectively. A study published in the Journal of the American Veterinary Medical Association found that typical work weeks for interns and residents exceeded 60 hours,[2] meaning the average intern and resident are earning only approximately $9.09 and $11.25 per hour in the 2020-2021 training year. By contrast, the Bureau of Labor Statistics found that the median hourly wage for fast food and counter workers in 2021 was $12.07.[3] Another study found that 92% of internship programs and 87% of residency programs paid below an hourly living wage when considering average hours worked against annual salary.[4]

---

[1] Samantha L. Morello, *Comparison of Resident and Intern Salaries with Current Living Wage as a Quantitative Estimate of Financial Strain Among Postgraduate Veterinary Trainees*, 260 JAVMA 124, 124 (Nov. 12, 2021), https://avmajournals.avma.org/view/journals/javma/260/1/javma.21-07-0336.xml.
[2] *Id.*
[3] U.S. Bureau of Labor Statistics, *Occupation Employment and Wages: Fast Food and Counter Workers* (May 2021), https://www.bls.gov/oes/2021/May/oes353023.htm.
[4] Samantha L. Morello, *Resident and Intern Salaries: Can Tracking Our Progress Help Us Understand Our Future?*, 261 JAVMA 758, 758 (2023), https://avmajournals.avma.org/view/journals/javma/261/5/javma.22.11.0516.xml.

70.    Many veterinary interns and residents work far more than 60 hours a week. Indeed, in 2022, AAVMC issued guidelines suggesting that on-duty hours for veterinary interns and residents be limited to 60 per week over a four-week period.[5]

71.    The poor pay veterinary interns and residents receive stands in contrast to the substantially higher pay new graduates foregoing an internship or residency receive. According to the American Veterinary Medical Association, the mean private practice salary in 2023 for new graduates was $125,416 and for public practice, $87,417.[6] Notably, there is no anticompetitive match process for new graduates seeking employment outside of internships and residencies.

## VIII.    NO PROCOMPETITIVE JUSTIFICATIONS

72.    Defendants' horizontal conspiracy to fix wages constitutes a *per se* violation of the Sherman Act.

73.    Alternatively, if the Rule of Reason applies, Defendants' conduct is anticompetitive because the Match Program has no procompetitive justification. Stripping veterinary interns and residents of bargaining power and depressing their wages has no benefit to the interns and residents, particularly when substantial numbers of veterinary internships and residencies are at for-profit veterinary practices and hospitals owned or backed by private equity firms.[7]

74.    Even if Defendants could show (which they cannot) that there were procompetitive justifications for the Match Program, such justification could have been reasonably achieved through less restrictive means. Defendants could create a streamlined internship and residency application process that does not strip Plaintiff and similarly situated veterinarians of their

---

[5] AAVMC, *AAVMC Guidelines for Veterinary Intern & Resident Wellbeing* (Oct. 2022), https://www.aavmc.org/wp-content/uploads/2022/10/AAVMC-Wellbeing-InternResident-Guidelines.pdf.
[6] R. Scott Nolen, *Veterinary Starting Salaries Rise in 2023, Educational Debt Holds Steady*, AVMA NEWS (Nov. 1, 2023), https://www.avma.org/news/veterinary-starting-salaries-rise-2023-educational-debt-holds-steady.
[7] *See, e.g.*, Andrew Perez, *'Life and Death' for Pets: Elizabeth Warren Targets Firm Buying Veterinary Offices*, ROLLING STONE (Aug. 7, 2024), https://www.rollingstone.com/politics/politics-news/elizabeth-warren-targets-private-equity-firm-veterinary-offices-1235075465/.

bargaining power in negotiating compensation and benefits. For instance, Defendants could create a common application that participating internships and residencies could use without barring applicants from negotiating inside or outside of the Match Program or requiring them to accept the first position they are offered.  Defendants could also refrain from exchanging competitively sensitive salary data and information and from issuing salary guidance.

## IX.  <u>CONTINUING VIOLATION</u>

75.    Defendants have engaged in continuing violations of the Sherman Act. The Match Program has existed since 1978, and the match process has occurred annually each year.

76.    Each September, Employer Defendants, Veterinary School Defendants, and other co-conspirators enter their internship and residency information into the VIRMP database. In October of each year, the Match Program publishes a list of available residency positions and internships, which it supplements until the beginning of November. Applicants may access the application and begin ranking programs in November and typically have until the first week of January to submit their applications. In February, applicants must submit rank order lists. In March, the Match Program releases match results. Following the release of match results, participating employers may reach out to unmatched applicants and make additional offers at their discretion.

77.    As described above, *see* ¶¶ 35-56, Defendants conduct the Match Program anew each year and take actions over the course of each year to effect their wage-fixing scheme.  Each such action by any Defendant in furtherance of its participation in the Match Program constitutes a continuing violation in furtherance of the conspiracy.

## X. CLASS ACTION ALLEGATIONS

78.     The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all individuals in the United States who obtained employment as veterinary interns or residents through the Match Program from May 30, 2021, until the Defendants' anticompetitive conduct ceases (the "Class Period").

79.     The Class Members are readily ascertainable and identifiable because records of Match Program participants should exist, the Class Members' identities are known to Defendants, and the Class Members may be notified of the pendency of this action by forms of notice customarily used in class actions.

80.     The Class contains thousands of similarly situated individuals and is therefore so numerous that joinder is impracticable. On information and belief, the number of proposed Class Members exceeds 5,500.

81.     Plaintiff's claims are typical of the Class. Plaintiff and the other Class Members were damaged by the same common course of conduct by Defendants.

82.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to those of the Class.

83.     Plaintiff will continue to fully and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel who are experienced in the prosecution of complex class action antitrust litigation.

84.     Questions of law and fact are common to the members of the Class and predominate over questions, if any, that may affect only individual members. Questions of law and fact common to the Class include:

    a.    whether Defendants have illegally contracted, combined and conspired to restrain competition in the recruitment, hiring, and employment of veterinary interns and residents;

    b.    whether Defendants have market power in the market for veterinary resident and intern services;

    c.    whether Plaintiff and the members of the Class have been injured by Defendants' conspiracy;

    d.    the amount of damages suffered by Plaintiff and members of the Class as a result of Defendants' illegal restraints; and

    e.    whether injunctive relief should issue to prohibit Defendants' illegal restraints.

85.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

86.    Plaintiff knows of no difficulties in maintenance of this action as a class action.

## XI.  ANTITRUST INJURY

87.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendants over compensation of veterinary interns and residents was restrained or

eliminated in the markets for veterinary interns and residents in the United States during the Class

Period.

88.     The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or

maintain the compensation of veterinary interns and residents in the United States, and, as a direct

and foreseeable result of the conspiratorial conduct, Plaintiff and Class Members received

compensation at artificially depressed rates during the Class Period.

89.     By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have

sustained injury, having received lower compensation during the Class Period than they would

have received in the absence of Defendants' illegal conspiracy. As a result, Plaintiff and the Class

have suffered damages.

90.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

## XII. <u>FIRST CAUSE OF ACTION</u>

### (Agreement, Sherman Act, 15 U.S.C. §1)

91.     Plaintiff incorporates and realleges, as fully set forth herein, each and every

allegation set forth in ¶1 through ¶90.

92.     Beginning in 1978 and continuing through the present, Defendants entered into an

agreement, understanding, and conspiracy in restraint of trade to artificially fix, stabilize, or

depress compensation paid to Class Members in violation of Section 1 of the Sherman Act, 15

U.S.C. §1.

93.     In formulating and carrying out their agreement and conspiracy, Defendants did

those things that they combined and conspired to do, including (as set forth more fully above),

prohibiting Match Program participants from negotiating inside or outside the Match Program

until match results are released and requiring participants to accept the position with which they match.

94.    To enforce the conspiracy, the Match Program requires both applicants and institutions/private practices to agree to electronic terms of service. Per the terms of service, "[n]either [the employer nor the applicant] may negotiate inside or outside the matching program until the match results have been announced. Doing so is a violation of VIRMP rules and will result in sanctions." Per the Match Program Terms of Service, failure of an applicant to abide by any of the rules "will result in a ban from participation in VIRMP for a period of at least three years."

95.    The conspiracy to depress, maintain, and stabilize compensation amongst veterinary interns and residents is a *per se* violation of Section 1 of the Sherman Act.

96.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Competition for the hiring of veterinary interns and residents has been restrained, suppressed, and/or eliminated in the United States; and

b.    Compensation paid to veterinary interns and residents has been fixed, depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States.

## XIII.   **DEMAND FOR RELIEF**

Plaintiff requests the following relief:

That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to Class Members;

That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and their co-conspirators;

That the Court enter judgment awarding damages to Plaintiff in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. §15(a), on his federal antitrust claims;

That the Court award Plaintiff pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

That the Court award Plaintiff the cost of this suit, including reasonable attorneys fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. §15, on their federal antitrust claims;

That the Court enjoin Defendants from their violations of law; and

That the Court order such other and further relief as this Court deems proper and just.

## XIV.    DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Date: May 30, 2025                                Respectfully Submitted,


                                                  /s/ Rosalie Pemberton Fessier
Steven F. Molo*                                   Rosalie Pemberton Fessier
New York Registration Number: 4221743             Virginia Bar Number: 39030
Cody A. Wiles*                                     **TIMBERLAKESMITH**
New York Registration Number: 5983895             25 North Central Avenue
**MOLOLAMKEN LLP**                                P. O. Box 108
430 Park Avenue                                   Staunton, VA 24402-0108
New York, NY 10022                                Telephone: 540-885-1517
Telephone: 212-607-5951                           Fax: 540/885-4537
smolo@mololamken.com                              rfessier@timberlakesmith.com
cwiles@mololamken.com
                                                  Joshua P. Davis*
Eric A. Posner*                                   California Bar Number: 193254
Illinois Bar Number: 6329216                      Julie A. Pollock*
**MOLOLAMKEN LLP**                                California Bar Number: 346081
300 N. LaSalle Street, Suite 5350                 Hope Brinn*
Chicago, IL 60654                                 California Bar Number: 338508
Telephone: 312-450-6700                           **BERGER MONTAGUE**
eposner@mololamken.com                            505 Montgomery Street,
                                                    Suite 625
Eric Nitz                                         San Francisco, CA 94111
Virginia Bar Number: 82471                        Telephone: 1-800-424-6690
**MOLOLAMKEN LLP**                                jdavis@bm.net
600 New Hampshire Avenue, N.W.,                   jpollock@bm.net
  Suite 500                                       hbrinn@bm.net
Washington, DC 20037
Telephone: 202-556-2000
enitz@mololamken.com


                                                  * Pro Hac Vice Application Forthcoming

                                                  *Counsel for Plaintiff and the Proposed Class*

26